[Civ. No. 3862.   Third Appellate District.—August 6, 1930.]

ANTONIO PIETROFITTA, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

W. D. Tillotson, George R. Freeman, Guy V. Shoup and Dunne, Dunne & Cook, for Appellant.

Jesse W. Carter, George Olshausen and Renzo Turco for Respondent.

THOMPSON (R. L.), J.—This is an appeal from a judgment for personal injuries which were sustained by the respondent in a railroad crossing collision.

The defendant's railroad track extends southerly from Redding in a straight and substantially level course for a distance of at least five miles. The railroad right of way is 100 feet in width and is fenced on either side. At the place where the accident occurred the state highway runs parallel and adjacent to the railroad right of way on the

westerly side thereof. The plaintiff owned a small ranch situated four and a half miles south of Redding and east of the track. A private roadway led at a right angle from the state highway across the railroad track. This was called the Pietrofitta crossing. Gates were maintained in the right of way fences on either side which communicated with this private way. These gates were frequently left open. This was so on the occasion of the accident. At the point where the accident occurred, and for a considerable distance on either side therefrom, the railroad track was constructed on a fill which was elevated about two and a half feet above the surface of the ground. This private roadway across the railroad track was also constructed on a fill which gradually ascended from the gates on either side to the level of the rails. There is substantial evidence to the effect that this crossing roadway was but eight or ten feet in width along its surface descending at the sides thereof quite sharply to the level of the ground and that it was rough, containing a hole just inside of the western gate, which was two feet or more in depth and five or six feet across. At a point commencing about 560 feet north from this railroad crossing the track entered a cut which left embankments on either side some three feet in height. Four or five hundred feet northerly from the Pietrofitta crossing there was also another private roadway intersecting the railroad right of way. This is called the Harris crossing. Just beyond this last-mentioned roadway an irrigation ditch crossed the right of way. A line of telegraph poles extends along the westerly half of the railroad right of way a distance of about fifteen feet easterly from the fence. A growth of mulberry bushes with foliage ten feet in height and some six feet in diameter stood at the northerly entrance to the Pietrofitta crossing. Along the line of the west fence, upon the embankment adjoining the cut through which the railroad track ran, at intervals upon the westerly half of the railroad right of way, other bushes were also growing. The plaintiff testified with respect to the bushes which were permitted to grow upon the right of way: "Q. Where was this bush you have referred to with relation to the machine (when you stopped at the gate) . . . ? A. On the left side going in, that is, toward Redding. Q. And about how far from your machine? A. Some of it was six foot away from

my machine and there was a lot of it. There was plenty of them bushes. . . . Q. You stated up north of the crossing near that cut there were some bushes, is that true? A. Yes. Q. And how many clumps of brush were there up there? A. Oh, all the way along there. Q. How high were these clumps of brush? A. Four, five, ten feet high."

On September 8, 1923, the plaintiff drove his Dodge truck southerly from Redding along the state highway parallel with the railroad track a distance of four and a half miles to the entrance to his crossing, at which he arrived about 11:45 o'clock A. M. A south-bound freight train had just passed this crossing. He turned his machine to his left from the highway on to this crossing road and stopped it with the front end just inside the gate. He then looked westerly along the railroad track, but neither saw nor heard an approaching train. He then shifted his clutch to low-gearing and slowly proceeded along the intervening space thirty or forty feet to the railroad track. When his machine was nearly across the track another freight train running ten or fifteen minutes behind the first section noiselessly approached from Redding and struck the rear end of his truck, hurling him and the machine into the ditch and demolishing the truck. The plaintiff sustained a broken arm and other severe bruises and injuries. There is evidence that his arm and shoulder are permanently disabled. The plaintiff neither saw nor heard the train until his truck was struck. He testified in that regard: "Q. You did not see the train at all until after the accident, is that correct? A. No, I didn't see the train until I got up. I thought there was a truck hit me. Q. And you did not hear the train approaching, did you? A. No."

Upon trial of the cause a verdict of $10,000 was rendered by the jury in favor of the plaintiff. A judgment was entered accordingly. From this judgment the appeal was perfected. The appellant contends that: (1) The evidence is insufficient to support the judgment; (2) The court erred in denying its motion for a nonsuit; (3) The plaintiff's contributory negligence precludes his right of recovery, and, (4) The court erred in curtailing the cross-examination of the plaintiff.

In support of the judgment the plaintiff relies upon the charge that the defendant negligently failed to ring the

bell or sound the whistle of the engine pursuant to section 486 of the Civil Code, as a warning of the approach of the train to the crossing. There is a conflict of evidence on this issue. This court is, therefore, bound by the implied finding of the jury, which was adverse to the appellant. The evidence in support of plaintiff's contention that neither the bell nor the whistle was sounded was negative in character. It has been frequently held, however, that such negative testimony is sufficient upon which to support a verdict. (*Kenna* v. *United Railroads*, 197 Cal. 148, 154 [239 Pac. 1061]; *Thompson* v. *Los Angeles etc. Ry. Co.*, 165 Cal. 748, 752 [134 Pac. 709]; *Badostain* v. *Pacific Elec. Ry. Co.*, 83 Cal. App. 290, 295 [256 Pac. 576]; *City of Sacramento* v. *Ilunger*, 79 Cal. App. 234, 244 [249 Pac. 223].) Mr. Harris, a neighbor who resided a few hundred feet northerly from the crossing, was watching the passing of the freight trains and testified regarding this subject that he heard no whistle or bell. His wife testified to the same thing. The plaintiff testified in this regard: "Q. When you looked up the track did you see any train or engine on the track? A. No. Q. Did you hear any bell or whistle? A. No. Q. Did you hear any noise from a train whatever? A. No. Q. Did you see any smoke from the engine? A. No." The brakeman, Bell, who was riding upon the eighth box-car behind the engine, testified: "Q. Did you hear a bell or whistle at the time the brakes were applied or immediately after that? A. No sir. Q. You didn't hear any immediately before that time? A. No sir." The engineer, Scott, contends that a crossing whistle was blown, but admits that no warning whistle was sounded after he saw the plaintiff approaching the crossing. He said: "Q. Now the train was drifting noiselessly, wasn't it? A. Yes sir. Q. And it had been drifting that way for about two miles? A. Yes sir. Q. After you saw the plaintiff did you blow the whistle? A. I had no time to blow the whistle. Q. Well, answer the question. A. No sir."

The chief problem presented on appeal is the charge of contributory negligence on the part of the plaintiff. It is contended that he failed to stop his machine at a reasonably advantageous point to look for an approaching train before attempting to cross the track. We are disposed to hold that the facts of this case render the issue

of contributory negligence a question for the determination of the jury. The implied finding to the effect that the plaintiff was not guilty of contributory negligence may therefore not be disturbed. ██ The question of contributory negligence is ordinarily one of fact for the decision of the jury. It is only such facts as will impel the court to infer that reasonable minds would not differ respecting the conclusion that the plaintiff was guilty of contributory negligence, which will warrant an interference with a contrary finding by the jury. (19 Cal. Jur. 735, sec. 141.) To be sure, the plaintiff was acquainted with the condition of this crossing, having lived in that vicinity for eight years. He also knew that some shrubbery was permitted to grow upon the railroad right of way which might obscure a clear view of the track to some extent. In determining the degree of care which would be expected from a reasonably cautious person in crossing the railroad track under the circumstances of this case the jury might consider the fact that a freight train had just passed and that one would not ordinarily expect another train so soon; that the train was "drifting noiselessly" toward the crossing; that close attention of the plaintiff was required in driving his machine across the track for the reason that there was a hole "about a foot and a half or two feet deep" and "about the same width as the machine" in the center of the crossing road "three or four feet past the gate"; that this crossing was narrow and rough, as the plaintiff testified. Section 485a of the Civil Code required the railroad company to "maintain such farm or private crossing in a good, safe and passable condition." The plaintiff did stop, look and listen for the approach of a train inside the gate. He said his machine was then fifteen or twenty feet from the track. This may have been a mere incorrect estimate of the distance. He also fixed this point at which he stopped as the edge of the hole in the road, which hole, he said, was "three or four foot past the gate." We may, therefore, assume his machine may have been some thirty-five feet from the track. But his view along the track was not then obstructed by the mulberry bushes at the left entrance to the gateway. He testified: "I didn't see no train for four or five hundred feet." It is contended he should have stopped at a point nearer the track. While there is a conflict of evi-

dence in that regard, there is some evidence to indicate his view would not have been extended by doing so. The defendant's attorney asked him: "Q. If you had stopped your machine within say ten feet from the track, is it not true that you could have seen that railroad track or a train . . . at least a half mile? A. About four or five hundred feet of this side and about six or seven hundred feet on the south side." It may be assumed that having obtained what he considered a clear view of the track for a distance of four or five hundred feet and seeing and hearing no train approaching he devoted his attention to driving his machine without again looking to the north. The cross-examination of the plaintiff discloses the following evidence regarding this subject: "Q. After you started up your machine at that time there at the gate did you at any time look either way from that crossing to see if any train was approaching? A. Yes, all the time. Q. You were then looking both ways all the time from the time you left the gate until you went over the railroad track . . . ? A. When I stop there I look on both sides as far as I can see and then I look straight on the road. . . . Q. After you started up your machine from the gate you did not look either north or south along the railroad track, did you? A. No, I couldn't look both ways. . . . It (the crossing road) wasn't wide enough to lose any time to look both ways. I had to look straight ahead."

It is true that one must be vigilant in crossing a railway track, which is itself a warning of danger and that the duty to exercise care in doing so is not fulfilled by carelessly glancing up the track and then blindly proceeding to cross in the face of danger. But the test of vigilance under particular circumstances will be determined by what a reasonably cautious person would do under similar circumstances. Assuming, as the plaintiff testified, that this was a rather narrow and somewhat rough road approaching the track with a substantial hole ahead of the machine, we may not say, as a matter of law, the plaintiff was guilty of contributory negligence in failing to again stop his machine, or in failing to repeatedly or constantly look for a train from the north. It became a question of fact for the jury to determine whether as a careful man exercising reasonable precautions for his safety the plaintiff could assume that

seeing and hearing no train for a distance of four or five hundred feet he would have sufficient time to drive his machine from the place where he stopped before a train could reach the crossing from a point beyond the limit of his vision. In the case of *Walker* v. *Southern Pac. Co.*, 38 Cal. App. 377 [176 Pac. 175], it was determined that the failure of the driver of an automobile to again stop or look for an approaching train after he had once stopped at a point seventy-five feet from the track, was a question of fact for the jury to decide. In that case the road crossing was also somewhat rough and required the close attention of the driver of the machine. It is true he was able to see down the track about 1,000 feet, while in the present case it is claimed the vision was limited to not more than half that distance. But upon the contrary, after the machine was stopped Walker had twice as far to drive as this plaintiff had in order to cross the track. We are unable to reasonably distinguish the Walker case from the present cause. It seems to be authority for the assertion that the question of contributory negligence in the present case was a problem for the jury to decide under the circumstances of this case. The facts upon which the case of *Stephenson* v. *Northwestern Pac. Ry. Co.*, 208 Cal. 749 [284 Pac. 913], was decided, and which is relied upon by the appellant, may be readily distinguished from the present case. In the last-mentioned case Stephenson had parked his car near a packing-house which obscured his view of the track. He testified that returning to his car, "After looking from a point opposite the corner of the packing house I did not look any more because I had already looked."

The court adds:

"The point from which the respondent last looked for a train prior to the collision was about opposite the corner of the packing house, which corner was the last obstruction to a clear view down the track in the direction from which the train came. At this point his vision down the track would be greatly increased. . . . He estimated that when he last looked he could see down the track (only) about one hundred feet. . . . The respondent did not testify that his attention was diverted by the surface of the street, nor does the testimony indicate that the condition of the street

was such as to require marked or more than ordinary attention.''

In the present case the plaintiff's vision extended at least four or five hundred feet down the track and he did testify that the condition of the road required his undivided attention.

■ We do not think the curtailing of the cross-examination of the plaintiff as to the size of his ranch was prejudicial error. No special damages were asked for or allowed. The plaintiff had testified without objection that owing to the injuries sustained from the accident he was required to employ one farm-hand all the time and sometimes two to help operate his place. There was no evidence of the wages which these men were paid. The testimony which was adduced was competent only for the purpose of showing the seriousness of the plaintiff's injuries. The acreage of his farm and the consequent number of men necessarily employed to operate it would not affect the amount of general damages recoverable as compensation for his personal injuries.

The judgment is affirmed.

Finch, P. J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 5, 1930, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal was denied by the Supreme Court on October 2, 1930.