[L. A. No. 20157. In Bank. Oct. 1, 1947.]

LEONARD ROY SPENDLOVE, Appellant, v. PACIFIC ELECTRIC RAILWAY COMPANY (a Corporation), Respondent.

OLEDA HARRISON, Appellant, v. PACIFIC ELECTRIC RAILWAY COMPANY (a Corporation), Respondent.

Westover & Smith and Joseph D. Taylor for Appellants.

C. W. Cornell, O. O. Collins and Malcolm Archbald for Respondent.

GIBSON, C. J.—Plaintiffs were injured when the automobile in which they were riding was struck by an electric car operated by defendant. The actions were consolidated for trial, and the appeal is taken from judgments of nonsuit.

The accident occurred in the afternoon of a clear day at a crossing where a public street running east and west intersected defendant's private right of way. There were four sets of tracks on the right of way; tracks one and two on the east carried northbound traffic, and tracks three and four to the west were used for southbound traffic. A wigwag signal was maintained at the crossing to warn vehicles of approaching trains.

The automobile was traveling west, and when it reached the right of way the wigwag was operating and a southbound car was standing on track four. The driver stopped to allow the southbound car to pass. At this point he could see 300 to 400 feet northward, but there was a trolley pole with a switch box on it directly opposite the driver which partially obstructed the view in that direction. When the wigwag stopped operating, the driver looked to the north and to the south and saw no approaching trains, and he listened for but did not hear any whistles or bells. He then started to cross the right of way at 5 miles per hour, and when he reached the first tracks he looked to the south. He looked ahead to the west and noted that the wigwag was not operating. The automobile traveled about 35 feet before reaching track three, where the collision occurred, and while moving this distance the driver's view to the north was unobstructed. When the automobile was approximately 5 feet from track three he looked to the north and then for the first time saw a southbound car on that track 25 to 30 feet away from the point of collision. It was traveling about 40 miles per hour and sounded no warning as it approached the intersection.

The evidence, viewed in the light most favorable to plaintiffs, is clearly sufficient to support a conclusion by the jury that defendant was negligent in operating its car at an excessive speed and in failing to sound a warning. It is not claimed that defendant was negligent with respect to the failure of the wigwag to operate, and we need not determine this question. Defendant's sole contention on appeal in support of the judgments is that the conduct of the driver of

the automobile showed contributory negligence as a matter of law. Plaintiff Spendlove was the owner of the automobile which was being driven by plaintiff Harrison's 19-year-old son, who had the permission of both plaintiffs to drive, and any negligence on the driver's part would be imputed to plaintiffs. (*Milgate* v. *Wraith,* 19 Cal.2d 297, 300 [121 P.2d 10]; Veh. Code, §§ 352(b), 402(a).)

When a flagman or mechanical warning device has been provided at a railroad crossing, the driver of an automobile is thereby encouraged to relax his vigilance, and, in using other means to discover whether there is danger of approaching trains, he is not required to exercise the same quantum of care as would otherwise be necessary. (*Startup* v. *Pacific Electric Ry. Co.,* 29 Cal.2d 866, 871 [180 P.2d 896]; *Toschi* v. *Christian,* 24 Cal.2d 354, 360 [149 P.2d 848]; *Will* v. *Southern Pacific Co.,* 18 Cal.2d 468, 474 [116 P.2d 44]; *Sheets* v. *Southern Pacific Co.,* 212 Cal. 509, 513 [299 P. 71]; *Gregg* v. *Western Pac. R. R. Co.,* 193 Cal. 212, 222 [223 P. 553].) In the Startup case we held that it was error for the court to instruct the jury that the driver of an automobile was negligent as a matter of law where it appeared that he stopped at a railroad crossing, waited for two trains to pass and a wigwag signal to stop operating, and then, without again looking, started to cross four sets of tracks and was struck by a train which was on the third set of tracks and had sounded no warning.

In the present case, a southbound car, referred to in the testimony as the "Watts local," was standing at the intersection. The wigwag was operating and the driver stopped the automobile and "waited for the Watts local to go by." The driver could not see the wigwag while the car was crossing in front of him, but he noticed that "as the rear of the Watts car cleared the intersection, the wigwag came to rest and the bell stopped ringing." He did not start into the right of way until the cessation of the wigwag indicated that it was safe for him to proceed across the tracks. The driver was asked, "Now, after starting across, after the wigwag had stopped and you started across, you looked west again, did the wigwag start again?" He answered, "No, it didn't."

It could reasonably be inferred that the driver stopped in response to the warning given by the wigwag, that he relied upon the wigwag to indicate when it was safe to pro-

ceed before starting, and while proceeding across the intersection he relied upon it to give warning of approaching trains. To hold otherwise would do violence to the elementary rule that on appeal from a judgment of nonsuit we must view the evidence in the light most favorable to plaintiff, drawing all reasonable inferences in his favor and disregarding all conflicting or contradictory evidence. The driver did not start until "the wigwag came to rest and the bell stopped ringing," and the fact that he also looked before he started to cross the tracks, does not negative the inference of reliance on the wigwag. In looking, he may have acted automatically from force of habit and looked less carefully because of reliance on the warning device. When he started he looked straight ahead, and while crossing the right of way he observed that the wigwag did not start again. The cessation of the wigwag was tantamount to an "all clear" signal, a sign that there was no imminent danger from oncoming trains, and since such danger was in fact impending, the wigwag by ceasing to function and failing to resume operation acted as a trap. In considering the right of the driver to rely on the wigwag, it is, of course, immaterial whether the failure of the warning device to operate was due to defendant's negligence.

The case of *Koster* v. *Southern Pac. Co.*, 207 Cal. 753 [279 P. 788], is not in point. There the driver of an automobile was killed at an unguarded crossing. Although a flagman was stationed at the crossing during certain hours of the day, he was not present when the accident occurred, and decedent knew that he was not customarily on duty at that hour. The court held that he was guilty of contributory negligence inasmuch as the physical facts demonstrated that, had he stopped, looked and listened, he would have been warned at a safe distance of the approach of the train. When the driver in the Koster case approached the intersection, he was not invited to proceed by the cessation of a warning signal given by a warning device or a flagman. If, however, the flagman had been present, giving a warning of danger, and the driver had stopped and waited until the flagman by ceasing to signal had indicated that it was safe to proceed, it would have been a question for the jury whether, under the circumstances, he was guilty of negligence. (See *Startup* v. *Pacific Elec. Ry. Co.*, 29 Cal.2d 866 [180 P.2d 896].) The case of *Jones* v. *Southern Pac. Co.*, 34 Cal.App. 629 [168 P. 586],

is distinguishable for the same reasons. *Heroux* v. *Atchison, T. & S. F. Ry.*, 28 Cal.App.2d 401 [82 P.2d 620], does not involve a guarded crossing. In the case of *Guyer* v. *Pacific Electric Ry. Co.*, 24 Cal.App.2d 499 [75 P.2d 550], the driver crossed in defiance of an operating signal.

Whether the driver in the present case could have seen the car from the point at which he stopped, and whether by the exercise of reasonable care he should have seen it, were questions for the jury. His failure to see the car may have been due to partial obstruction of his view by the pole and box, or the car may not then have come within his area of vision. It is also possible, as we have seen, that because of his reliance on the wigwag, he looked less carefully than he otherwise would have.

It was likewise a question for the jury whether the driver was guilty of negligence in failing to look to the north after starting to cross the right of way until the automobile was only 5 feet from track three. The driver's view was unobstructed as the automobile entered the right of way, and, if he looked to the north then, he could have seen the train approaching. Instead he looked straight ahead. He observed that the wigwag was not operating, and just as he started to look to the north his mother "shrieked." He then saw the car for the first time. In the Startup case the driver did not look to the right or left *before or after* he started into the intersection, and we held that since the wigwag had ceased to give the danger signal it became a question for the jury whether the driver was guilty of negligence in failing to look. (29 Cal.2d 866.) Here the jury could have found that the driver relaxed his vigilance in reliance upon the wigwag, and we cannot say as a matter of law that he was negligent in failing to look to the north sooner than he did. He took more precautions for his safety and that of his passengers than did the driver in the Startup case, and we held there that "where it is shown that a [driver] has exercised some care, the question whether or not the care actually exercised was due and sufficient will always be a matter for determination by a jury." (29 Cal.2d 866, 871; *Koch* v. *Southern Cal. Ry. Co.*, 148 Cal. 677, 680 [84 P. 176, 113 Am.St.Rep. 332, 7 Ann.Cas. 795, 4 L.R.A. N.S. 521].)

It was also a question for the jury whether the driver was guilty of negligence in failing to stop when he saw the approaching car. The automobile was then approximately 5

feet from the point of collision, and the car was traveling at 40 miles an hour and was 25 or 30 feet away. The automobile was going 5 or 6 miles an hour as it crossed the intersection, and plaintiff Spendlove testified that at that speed the automobile could be stopped within 1 foot. It is argued that since the automobile was 5 feet from track three when the driver saw the car he was guilty of negligence as a matter of law in not stopping the automobile before it reached the path of the oncoming car. The driver testified, however, that he did not have time ''to do anything'' after he saw the car. He said, ''It hit us just about the time I saw it.'' Under the circumstances we cannot say as a matter of law that the driver was guilty of contributory negligence.

The judgments are reversed.

Shenk, J., Carter, J., Traynor, J., and Spence, J., concurred.

SCHAUER, J.—I dissent. It has heretofore been the established law of this state that, in the absence of extraordinary circumstances such as existed in *Toschi* v. *Christian* (1944), 24 Cal.2d 354 [149 P.2d 848], and in *Startup* v. *Pacific Electric* (1947), 29 Cal.2d 866 [180 P.2d 896], a person who approaches railroad tracks with a substantially unobstructed view, who sees such tracks, looks for traffic thereon, and then endeavors to cross them immediately before an approaching train, which is not only an actual hazard but which also is plainly visible and obviously an imminent peril, is guilty of negligence as a matter of law. (See *Guyer* v. *Pacific Electric Ry. Co.* (1938), 24 Cal.App.2d 499, 502 [75 P.2d 550]; *Heroux* v. *Atchison, T. & S. F. Ry. Co.* (1938), 28 Cal.App.2d 401, 405 [82 P.2d 620]; *Jones* v. *Southern Pacific Co.* (1917), 34 Cal.App. 629, 631 [168 P. 856]; *Koster* v. *Southern Pacific Co.* (1929), 207 Cal. 753, 761 et seq. [279 P. 788].)

In *Toschi* v. *Christian* the circumstances showed a six-track railroad-yard crossing, switching operations progressing almost constantly, the employment by the railroad of two flagmen whose duties involved traffic control on the railroad as well as on the highway and a practical necessity for persons using the highway to rely on the flagmen's signals; it was further shown that the plaintiff driver of the truck was familiar with the crossing, that one of the flagmen was absent

from his usual station, that the other was present with his stop signal under his arm and was playing with a hand mirror by flashing sunlight from it, that the plaintiff immediately before making a left turn to cross the tracks could not have seen the approaching engine by looking to his left and could not, perhaps, by reason of the size and shape of his vehicle, have seen it by looking to the rear. Where it further appeared that the driver stopped on the tracks when he was temporarily blinded by a flash of sunlight from the flagman's mirror and was there struck by the engine, we held that under all the circumstances it was a question of fact whether such driver was contributively negligent in driving his vehicle into the position of peril in front of the approaching locomotive. Certainly that case distinguishes itself factually from the case at bar.

In *Startup* (29 Cal.2d 866), another crossing case, "the signaling system was so constructed that when one train followed another on track three, within 600 feet, the wigwag would cease to operate when the first train cleared the crossing, thereby indicating that traffic could cross the tracks in safety, notwithstanding the existence of imminent danger from the following train. . . . There was evidence that the wigwag was not working as the three-car train approached the intersection on track three and that the single car which passed the intersection shortly ahead of the three-car train was also traveling on track three. It could be inferred that the wigwag stopped because the three-car train was following the single car on the same track and within the distance in which the wigwag would not operate." The driver of the automobile relied exclusively upon the wigwag signal and when it ceased operating proceeded to cross the track without looking further for railroad traffic and was struck by the following train on track three. As stated at page 870 of 29 Cal.2d, "He started across the tracks without again looking only, when *in reliance on the cessation of the wigwag,* it appeared to him that he could do so in safety." (Italics added.) Upon the above state of facts it was held not to be contributory negligence as a matter of law for the driver to attempt to cross the tracks *without looking.* The essential elements of the proposition, in my estimation, are reliance upon the signal system, with its entrapment possibility and consequently induced failure to look. The crucial question, which I thought in that case was a proper one under our concept of negli-

gence law to be resolved by the jury, rather than by the court, was this: Was the *failure of the driver to look,* under all the circumstances related, consonant with ordinary care?

But here we have a case which I feel to be materially different rather than substantially the same as implied in the majority opinion. Here there is no showing of entrapment of the driver. The driver, by his own testimony*, did not rely upon the signal system and because of such reliance fail to look. He does not claim either to have failed to look at all or to have looked less carefully because of the signal or its operation. According to his testimony, when the Watts local car had cleared the crossing, he "looked to the south and to the north," then "straight ahead," and proceeded on to the tracks. The physical facts and uncontradicted evidence establish that for at least the last 35 feet of the automobile's approach the defendant's car was plainly open to the view of the driver, unless his view was obscured by the persons (the two plaintiffs) in the front seat with him, and was approaching in such proximity and at such speed that it constituted an imminent and obvious peril. Plaintiff Spendlove testified, "I looked up and saw it coming and it looked like the side of a mountain." He also testified, concerning the driver and himself, "We were both in a hurry."

---

*The driver testified that: "We turned into 60th and pulled up a little incline there; then we waited for the Watts local to go by, and as it pulled away we started up onto the track. . . . [After stopping about 6 feet east of the most easterly track and waiting for the local Watts car to clear the crossing] I looked to the south, then to the north, then pulled on up onto the tracks. Then I looked straight ahead at that time as we started up. Then, as we were about to enter the southbound line I looked again to the north, and that is when I saw the mail car that hit us. . . . [It was then] Approximately 30 feet or 35 feet" away. The automobile at that time "was approximately five feet from the easterly track, rail, of the southbound interline track . . . [traveling] Not more than five miles an hour." The witness repeated: "I looked to the south and then to the north, and then we pulled up, starting across the tracks. . . . As I said before, I looked to the south and then to the north; then we pulled up. . . . [The mail car was traveling] Approximately, I would say around 25 miles an hour or more. . . . [J]ust as I started to look to the north again was when Mrs. Harrison, my mother, shrieked; and that was the first time I saw the mail car. It hit us just about the time I saw it. . . . I did not see it [the wigwag] in motion or hear any wigwag. . . . [By way of explanation, on redirect] I didn't see any motion or hear any bells from the wigwag after the Watts local had passed the crossing." He said that his vision was not "interfered with in any way by Mr. Spendlove or Mrs. Harrison, who were sitting in the front seat" with him.

The automobile, immediately preceding the collision, was traveling 5 to 6 miles an hour and, according to plaintiff Spendlove's testimony, could have been stopped within 1 foot.

At first thought it may seem incongruous to suggest that one may rely upon a signal and not look at all and have it a question of fact whether his failure to look was consonant with reasonable care (as was held in Startup), but that one who observed the signal and nevertheless looked, should be guilty of contributory negligence as a matter of law. But is it necessarily incongruous? Reliance upon the signal seems to me to be the pivotal fact. If, in the Startup case, to all of its circumstances narrated, we add the further or different fact that the driver *looked and saw* the approaching train and, notwithstanding ample opportunity to stop, still continued on into its path, we must have reached a different result. If he had not relied upon the signal, but had looked and failed to heed that which was plainly visible and which, according to judicially established standards, a person exercising ordinary care must have seen and noted, would the result be different? No signal device yet invented can constitute a more obvious or significant warning than is inherent in the close approach of a speeding and plainly visible train. To disregard that warning is, within the bounds of reason and human experience, essentially negligent.

If a railroad, in the exercise of caution, should install two wigwags side by side at a crossing and one should fail to function, but the other flashed and swung its red light and sounded its bell, would we hold that a driver could look at the still one and in reliance on its assumed invitation disregard the warning of the other? To pose the question seems absurd. And surely an approaching speeding train, plainly visible, has a portent of warning equivalent to a second wigwag. Under the circumstances of the Startup case the driver was possibly misled into justifiably not looking at all for the second warning signal—the approaching train—but in this case he says he did look. The plaintiffs are bound by his testimony. He makes no claim that he relied upon the signal or was misled by it or looked any the less carefully by reason of the presence of the signal device. It is inconsistent with the driver's own testimony for us to assume that he did rely in any degree on the signal. The second warning here—in the shape of the speeding 103,800-pound car—was plainly visible and an imminent hazard. The uncontroverted evi-

dence, including the physical facts reflected by the photographs, establishes that for at least the last 35 feet of plaintiffs' approach to the point of collision the defendant's car was visible to any person of normal eyesight in the position of the plaintiffs' driver, who looked in the direction from which the car came. The automobile, as previously mentioned, was traveling at approximately 5 miles an hour; the driver could stop it in 1 foot; he looked and yet proceeded into the inevitable path of that car. There is no claim—or evidence to support a claim—that the driver, having seen the approaching car, misjudged its distance and speed and was struck because of its excess speed.

The majority apparently rest their decision upon the proposition, quoted in the Startup case (29 Cal.2d 866, 871) from *Koch* v. *Southern California Ry. Co.* (1906), 148 Cal. 677, 680 [84 P. 176, 113 Am.St.Rep. 332, 7 Ann.Cas. 795, 4 L.R.A. N. S. 521], that ". . . where it is shown that a [driver] has exercised some care, the question whether or not the care actually exercised was due and sufficient will always be a matter for determination by a jury." If that proposition is to be strictly adhered to it means that in practically no case whatsoever can we hold that as a matter of law a man's conduct (be he plaintiff or defendant) amounts to negligence. But I do not think that such proposition will be strictly followed. Actually, it was not followed in the Koch case. The very next sentence of the opinion there (p. 680 of 148 Cal.) continues, "But where, as here, the unconflicting evidence shows that he exercised no care whatsoever, it becomes a question of law to say whether or not such a plaintiff's case shall be submitted to the jury. If it is so submitted, it can only be upon the theory that the open gates were an absolute warranty of safety, justifying the plaintiff in proceeding without any heed or caution. It is for this proposition that appellant contends. But such we do not understand to be the law. A railway crossing is itself a place of danger and is an effectual warning of danger, a warning which must always be heeded, and the exercise of ordinary care in traveling over such a place is not excused by the negligent omission of the railway company itself to exercise reasonable care. [Citations.] Nor is it the law that when a railroad company adopts safety gates or any other appliance for the protection of the public, the public is thereby absolved from

all duty of taking care of itself. A person is still required to exercise due and ordinary care, and while the *quantum* of care which will be reasonable may be less where the gates are provided *and are relied upon* by the traveler, still the gates themselves are not an assurance and a warranty such as to justify a traveler in going blindly ahead in total disregard of all ordinary precautions, as did the plaintiff in this instance.'' (Italics added.)

The rule which I think we should continue to follow has been stated in 19 California Jurisprudence 735 et seq. (§ 141) as follows: ''Contributory negligence, like defendant's negligence, becomes a question of law . . . when the evidence is such that the court is impelled to say that it is not in conflict on the facts and that from these facts reasonable men can draw but one inference, namely, an inference pointing unerringly to or against contributory negligence upon the part of the plaintiff. Thus contributory negligence may be declared as a matter of law where the standard of conduct required under the circumstances is obvious, or where the conduct required under the circumstances has been settled by judicial decision.'' It seems to me that here not only has the standard of conduct been settled by judicial decision, but that we are impelled to say that the undisputed evidence, or all of the evidence regarded in any light, is such that reasonable men can draw but one inference, namely, an inference pointing inescapably to contributory negligence of the driver of the automobile. (See *Toschi* v. *Christian* (1944), *supra,* 24 Cal.2d 354, 360, 362.) Such negligence, if any, it is conceded, is on the facts of this case imputable to the plaintiffs.

Under the circumstances of this case, as above pointed out, it seems inescapable that, contrary to the situation deemed possible in Startup, the driver was not the victim of a trap, he was not misled, and since he did look and since he had a wholly unobstructed view of the obvious peril for at least the last 35 feet of his approach, the rules of law hereinabove referred to should be followed as controlling unless the majority see fit to squarely overrule them. Those rules, which were followed by the trial judge, and by the District Court of Appeal in its unanimous opinion (authored by Mr. Justice McComb, reported at 177 P.2d 27), unless overruled, require that the judgments be affirmed.